JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ELIGIO CEDEÑO

**DEFENDANTS**

BOLIVARIAN REPUBLIC OF VENEZUELA

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pedro J. Martinez-Fraga (752282); C. Ryan Reetz
(934062), Bryan Cave Leighton Paisner LLP, 200 South
Biscayne Blvd. #400. Miami. FL  33131 786-322-7500

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☒ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28:1602

Brief description of cause:
28:1602 - Foreign Sovereign Immunities Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 767,953,994

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
10/24/2025

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.

ELIGIO CEDEÑO,

     Plaintiff,

vs.

BOLIVARIAN REPUBLIC OF VENEZUELA,

     Defendant.

_____/

## COMPLAINT

Plaintiff Eligio Cedeño, by his attorneys Bryan Cave Leighton Paisner LLP, brings this Complaint against Defendant Bolivarian Republic of Venezuela ("Venezuela"), alleging as follows:

## INTRODUCTION

1.　　This is an action brought to recognize and enforce a final foreign money judgment rendered on June 13, 2022 against Venezuela by the Supreme Tribunal of Justice, the highest court of law in Venezuela (the "TSJ"), which due to persecution by the Maduro regime is seated in Doral, Florida.  A true and correct copy of the TSJ's June 13, 2022 Judgment is here attached in the Spanish language original and in English language as **Composite Exhibit A**.[1]

---

[1]　　Also attached as part of **Composite Exhibit A** is the original English language and Spanish language translation of the document styled, "*Notice of Compliance*," dated December 13, 2021, referenced on p. 32 of the June 13, 2022 Judgment.

CASE NO.

2.      This Complaint arises out of an international tragedy: the usurpation of power in Venezuela by the late Hugo Chávez ("Chávez") and Nicolás Maduro Moros ("Maduro"), a wanted criminal and narcoterrorist.

3.      Indeed, the U. S. Department of State has published a reward, "increase of up to $50,000,000 USD for information leading to the arrest and/or conviction of the leader of the specially designated global terrorist *Cartel de Los Soles*."[2]   Attached as **Exhibit B**. Thus, Maduro's status as a criminal leading an international criminal enterprise has been amply chronicled.

4.      Plaintiff, like many Venezuelans, was an opponent of the Chávez/Maduro regimes, and provided financial support to its political opponents.   As a result, Plaintiff was, among other things including expropriations of all his assets and commercial enterprises, physically and psychologically tortured, falsely imprisoned, and forced to flee Venezuela as part of a broader scheme to terrorize and intimidate judges and opponents of the narcoterrorist regime.   The Maduro regime used Plaintiff as an ominous warning and example to those who opposed the regime.

5.      Plaintiff subsequently sought relief from international human rights bodies recognized by Venezuelan courts, which declared that his detention was wrongful and that he was entitled to "appropriate compensation."   A detailed account of the "Views of the Human Rights Committee under Article 5, paragraph 4, of the Optional Protocol to the International Covenant on Civil and Political Rights (106th Session)" is set forth later in this pleading.

---

[2]      United States Department of State, REWARD Increase of Up to $50,000,000 USD, for information leading to the arrest and/or conviction of the leader of the specially designated global terrorist Cartel de Los Soles.   *See*,   https://www.state.gov/wp-content/uploads/2025/08/2025-8-1-English-Poster-for-Nicolas-Maduro-Moros-Accessible-Clean.pdf.

CASE NO.

6.      After Maduro fraudulently claimed to have won a second term, the United States government imposed sanctions on Venezuela, blocking certain Venezuelan government assets.  The U.S. Department of State went on to recognize the Venezuelan National Assembly ("VNA") elected in 2015, as the country's legitimate government.[3]

7.      Although the VNA currently is in exile, the United States has provided it with access to Venezuelan assets that would otherwise have been blocked, in order to settle Venezuela's debts.  At issue before this Court is one such debt.

8.      Plaintiff sought redress and compensation in the judicial branch of Venezuela, constitutionally established by the VNA, pursuant to ¶ 9 of the United Nations Human Rights Committee's imperative contained in *Views of the Human Rights Committee under Art. 5, ¶ 4, of the Optional Protocol to the International Covenant on Civil and Political Rights (106th Session)*, Communication No. 1940/2010 ("UNHRC Opinion").  UNHRC Views/Opinion, Communication No. 1940/2010 is here attached as **Exhibit C**.[4]

9.      A trial was thus held on the single issue of damages before the TSJ.  Venezuela fully participated in this proceeding before the highest court of its own judicial branch of government.  At the conclusion of protracted proceedings, the TSJ found in favor of Plaintiff and against Venezuela and awarded Plaintiff US$ 767,953,994.95 in damages.

10.      Venezuela has nonetheless refused to honor the judgment of its own highest court, that the VNA itself consequently appointed consonant with the Venezuelan Constitution.   Accordingly, Plaintiff has no recourse but to bring this lawsuit for

---

[3]      *See* https://2021-2025.state.gov/venezuelas-interim-government-and-the-2015-national-assembly/.

[4]      *Views of the Human Rights Committee under Art. 5, ¶ 4, of the Optional Protocol to the International Covenant on Civil and Political Rights (106th Session)*, Communication No. 1940/2010 (October 29, 2012).

recognition and enforcement of the TSJ's judgment so that he might be compensated for the crimes perpetrated against him by Venezuela.

## PARTIES

11.     Plaintiff Mr. Eligio Cedeño ("Plaintiff") is an individual residing in Miami, Florida.  Plaintiff is a political refugee.[5]

12.     Defendant Venezuela is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330 et seq.  The physical territory of Venezuela is controlled by the illegitimate Maduro regime.  This regime is not recognized by a number of States, including the United States of America.[6]

13.     The democratically elected and internationally recognized government of Venezuela is the unicameral VNA convened on January 6, 2016, following elections held on December 6, 2015.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1330(a) because this is a "nonjury civil action against a foreign state" on claims "with respect to which the foreign state is not entitled to immunity" under the FSIA.

15.     Pursuant to § 1605(a)(1) of the FSIA, Venezuela is not entitled to immunity in this action because it waived immunity by voluntarily appearing and litigating to judgment before the TSJ, which was seated in the United States.  Venezuela fully participated in the TSJ proceedings in all respects through its duly authorized Special

---

[5]     Attached as **Exhibit D** is Department of Homeland Security, Form I-94 identifying "Asylum Status Granted Indefinitely Section 208" as of June 15, 2011.

[6]     The Maduro regime is not recognized by the following States:  Argentine Republic, Canada, Republic of Chile, Republic of Costa Rica, Republic of El Salvador, Republic of Guatemala, Republic of Panama, Republic of Paraguay, Republic of Peru, Dominican Republic, Oriental Republic of Uruguay, most of the European Union, Commonwealth of Australia, The State of Israel, Japan, and Kingdom of Morocco.

CASE NO.

Prosecutor and had ample opportunity—and indeed did—raise any substantive and procedural defenses that it had before the TSJ.  Venezuela never objected to the jurisdiction of the TSJ or a hearing in the United States, and it did not claim sovereign immunity.  As that litigation was seated in the United States and the specific assets and class of assets at issue were in the United States, Venezuela knew and intended that enforcement of the TSJ judgment would proceed in the United States and in U.S. courts through U.S.-controlled assets and U.S.-licensed channels.  This action therefore falls within the waiver exception to immunity set forth in the FSIA.

16.     Moreover, as more fully set forth below (¶¶ 46-48, 112) by seeking and accepting OFAC licenses, including License No. 42, for the express purpose of settling and paying its debts with assets in the United States, Venezuela has waived sovereign immunity with respect to its debt to Plaintiff.

17.     Further, pursuant to § 1605(a)(2) of the FSIA, Venezuela is not immune from suit because its failure to satisfy the TSJ's judgment is commercial nonpayment of a liquidated debt arising from a final money judgment.  Venezuela's refusal to pay is an act outside the United States undertaken in connection with debt-settlement activity and payment activity directed to the United States, with payment to be made in the United States.  The resulting nonpayment caused a direct effect in the United States because payment was due in the United States through U.S. controlled assets and U.S. licensed channels.  Furthermore, Venezuela carried on commercial activity in the United States in negotiating the payment of the TSJ's judgment, and the action is based upon that commercial activity.  This action therefore falls within the commercial-activity exception to immunity set forth in the FSIA.

CASE NO.

18.    Further, pursuant to § 1605(a)(3) of the FSIA, Venezuela is not immune from suit because its failure to satisfy the TSJ's judgment is an expropriation in violation of international law and meets the requirements of the expropriation exception.  Plaintiff owns a final money judgment issued on June 13, 2022 by the TSJ sitting in Doral, Florida. That judgment is a vested property interest, which was expropriated by Venezuela due to its failure to pay.  The property in issue is present in the United States and therefore effects a taking tied to U.S.-present property.[7]  This action therefore falls within the expropriation exception to immunity set forth in the FSIA.

19.    Further, pursuant to 28 U.S.C. § 1605(a)(6) Venezuela is not immune from suit because by becoming a signatory to the International Covenant on Civil and Political Rights ("ICCPR"), and to this Covenant's Optional Protocol, as well as its own domestic constitutional provisions, Venezuela has agreed to a process of binding, non-judicial resolution of relevant disputes of the UNHRC at the United Nations Headquarters in New York and at the United Nations Office in Geneva, Switzerland (at UNHRC's discretion), Defendant has entered into an agreement with and for the benefit of Plaintiff (formed by Plaintiff's commencement of a UNHRC proceeding pursuant to the Protocol) to arbitrate differences within the legal relationships defined by the ICCPR, with the intention that the arbitration take place in the United States or Switzerland, and a portion of which arbitration (tribunal election) did take place in the United States.  Jurisdiction thus exists to enforce the UNHRC's Views, which are an arbitration award, pursuant to 28 U.S.C. § 1605(a)(6).

---

[7]    For this reason, in addition to other grounds, *Nelson J. Mezerhane v. Republic of Venezuela, et al.*, 785 F.3d 545, 551 (11th Cir. 2015) citing to *dicta* in *Josefina Najarro De Sanchez, v. Banco Central De Nicaragua, et al.*, 770 F.2d 1385 (5th Cir. 1985) is not here applicable.

CASE NO.

20.     This Court has personal jurisdiction over Venezuela under 28 U.S.C. § 1330(b) because Venezuela is a foreign sovereign; it is not entitled to immunity for the reasons set forth above; and it will be duly served as provided by the FSIA, 28 U.S.C. § 1608(a).

21.     Venue is proper in this district under 28 U.S.C. § 1391(f)(1), as a substantial part of events or omissions giving rise to the claim occurred in this district and the property that is the subject of this action is situated in this district.

## FACTUAL ALLEGATIONS

### The Narcoterrorism Conspiracy

22.     Since at least 1999, Maduro, Chávez, and other corrupt Venezuelan officials participated in a violent narcoterrorism conspiracy between the Venezuelan *Cartel de Los Soles* ("CLS") and the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC").

23.     As of at least 1999, the FARC has been a terrorist organization that became one of the largest producers of cocaine in the world.  It habitually perpetrated acts of violence against United States nationals and property.

24.     FARC is and was designated by the U.S. Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act.

25.     At minimum since 1999, the CLS, or "Cartel of the Suns," has been a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who abuse the Venezuelan people and corrupt the legitimate institutions of Venezuela— including parts of the military, intelligence apparatus, legislature, and the judiciary—to facilitate the importation of tons of cocaine into the United States.

CASE NO.

26.     At a minimum, Maduro, Chávez, the CLS, FARC, and numerous other corrupt Venezuelan officials have conspired to engage in narcoterrorism by importing hundreds of tons of illegal narcotics into the United States.  The CLS, Chávez, and Maduro protected and coordinated with FARC and each other, to interfere with drug-trafficking investigations in Venezuela and elsewhere, provided FARC with military grade weapons, and distributed and continue to distribute illegal narcotics in the United States.

27.     Starting in approximately 2005, Chávez (at the time the President of Venezuela) instructed Maduro (at the time a member of the Venezuelan National Assembly), that Venezuelan judges who would not protect FARC must be removed.

28.     In 2006, Maduro was named the Foreign Minister of Venezuela.  That same year, Maduro and other members of the conspiracy received $5 million from FARC. Maduro conspired with other corrupt officials to launder millions of dollars for FARC, including through the purchase of seemingly legitimate goods in international trade.

29.     In 2008, Chávez agreed with one of the leaders of the CLS to use funds from Venezuela's state-owned oil producer, *Petroleos de Venezuela* ("PDVSA"), to support FARC's drug-trafficking and narcoterrorism operations.

30.     In 2013, Maduro succeeded Chávez as the President of Venezuela.

31.     Months later, 1.3 tons of cocaine dispatched by the CLS was seized at an airport in Paris.  Following this seizure, Maduro met with other co-conspirators to discuss how to avoid future seizures and authorized the arrest of certain Venezuelan military officials in an effort to divert scrutiny from his participation in the narcoterrorism conspiracy.

32.     In subsequent years Maduro continued to facilitate FARC's narcoterrorism, including by using Venezuela's military to threaten Aruba after that State arrested a member of the CLS in 2014, and by providing military-grade weapons to FARC.

33.     In a 2015 meeting held in Maduro's presidential hangar at the Maiquetía Airport, two relatives and co-conspirators of Maduro's inner circle dispatched hundreds of kilograms of cocaine shipments.  During this meeting the relatives discussed how they were at "war" with the United States, and indicated that they intended to use tens of millions of dollars in drug proceeds to help Maduro's wife get elected to the VNA as part of a broader plan to control it.  Opposing candidates, according to this scheme, would be "locked up."

### The Maduro Regime's Illegal Seizure of Power

34.     In 2015, politicians opposed to the Maduro regime won a majority of seats in elections held for the VNA.  The VNA convened on January 6, 2016.   Pursuant to the Venezuelan Constitution, members of the unicameral VNA serve five- (5) year terms and can be reelected for the maximum of two (2) additional terms.[8]

35.     Maduro and his co-conspirators subsequently packed Venezuela's Supreme Tribunal of Justice with supporters of his regime, who in turn purported to strip the VNA of authority granted to it by the Venezuelan Constitution.  This effort to control the VNA was unconstitutional and lacked a legal basis.  It was an illicit and unprecedented act. Maduro proceeded to organize a new "Constituent National Assembly" that usurped the VNA's constitutional role as Venezuela's legitimate legislative body.   The new "Constitutional National Assembly" forming part of the Maduro regime is not recognized

---

[8]     *See* Article 192 of the Constitution of the Bolivarian Republic of Venezuela.

by the United States.    It is viewed as an illegitimate/rogue "government branch" by numerous democratic States that prioritize democracy and the rule of law.

36.    In response to having confected an unconstitutional "Constitutional National Assembly," the opposition-led VNA appointed thirty-three (33) new magistrates to the Supreme Tribunal of Justice (*Tribunal Supremo de Justicia* or TSJ), who were not recognized by the Maduro regime.[9]  This configuration created a *de jure* Supreme Tribunal of Justice in exile (TSJ) that, while not recognized by the Maduro regime, is in fact the legitimate court of last resort under Venezuelan law.  It now stands as the only functioning branch of the Venezuelan government that was constitutionally enacted, as its membership was appointed for a twelve- (12) year term that expires in 2029.

37.    In 2018, Maduro falsely claimed to have won a second term in a presidential election that was marred by severe irregularities.  All accredited neutral national and international observers were of a single voice in concluding that Maduro lost by a historic landslide.  Nonetheless, Maduro declared himself to have been "inaugurated" for a second term on January 10, 2019, triggering a constitutional crisis in Venezuela and giving rise to national and international protests.

38.    The VNA, having been legitimately and constitutionally elected, rejected Maduro's usurpation of power in Venezuela and named Juan Guaidó as President of Venezuela's interim government in keeping with Venezuela's constitutional mandate under the circumstances.

---

[9]        Article 264 of the *Constitution of the Bolivarian Republic of Venezuela* provides that Supreme Court Justices shall be elected to a single twelve- (12) year term.  Indeed, because the VNA's term expired in 2021 and the TSJ's term does not expire until 2029, the TSJ remains as the single democratically and constitutionally elected branch of the Venezuelan government in exile *and* within the geopolitical boundaries of Venezuela.

CASE NO.

39.     Street protests opposing the Maduro regime's illegal seizure of power were suppressed by force.  Guaidó himself was arrested and briefly detained by the Maduro regime on January 13, 2019, before ultimately being released as a consequence of U.S. and international protests.

40.     The international community, including the U. S. government and more than 50 governments around the world, recognized Guaidó as the legitimate President of Venezuela and the VNA as the legitimate legislative body of Venezuela.  The United States recognizes and continues to recognize the VNA as the legitimate government of Venezuela and Venezuela's only lawfully elected legislative body.

41.     As recently as August 29, 2025, the U.S. position recognizes the VNA as the legitimate government of Venezuela as reiterated in the public records.  In *Petroleos De Venezuela S.A. et al v. MUFG Union Bank, N.A. et al.'s*[10], *Statement of Interest of the United States of America*, the United States reiterated in no uncertain language its recognition of the VNA as Venezuela's legitimate government:

> The United States respectfully provides this [ ] Statement of Interest… to *affirm its recognition of*, and *firm support for*, the 2015 National Assembly of Venezuela as the *only* government of Venezuela.   The 2015 National Assembly is the only government of Venezuela duly elected by the Venezuelan people ….
>
> As set forth in Ambassador's Kozak's letter, 'Nicolás Maduro and his coterie of corrupt associates have ravaged Venezuela's economy, *inflicted serious human right abuses upon innocent citizens*, and have exploited and squandered the Venezuelan people's assets.' [Citation omitted.]  Since the United States' 2020 Statement of Interest, the 'plight of the Venezuelan people has only worsened due to Maduro's cruelty, corruption, and inhuman indifference to the misery of tens of millions of his countrymen.'  In the Venezuelan presidential election held in July 2024 Maduro, 'falsely and baselessly declared himself the winner,' despite

---

[10]      *Petróleos de Venezuela S.A. PDVSA Petróleo, S.A. and POV Holding Inc., v. MUFG Union Bank, N.A. and Glas Americas LLC*, Case No.  1:19-cv-10023, Document No. 393 (August 29, 2025) (Judge Katherine Polk Failla) (S.D.N.Y. 2020).

CASE NO.

evidence that Venezuelan 'citizens overwhelmingly cast their ballots for opposition candidate Edmundo González Urrutia.' Since then, Maduro has 'unleashed a campaign of terror and repression that Maduro and his associates mistakenly hope will break the will of the Venezuelan people.'

(Emphasis supplied.)

42.     This state of affairs caused the United States to impose sanctions on Venezuela.  The U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has blocked numerous Venezuelan government assets, including assets controlled by PDVSA.   Additionally, U.S. federal district courts have frozen over a billion U.S. dollars in assets originating in Venezuela that are the spoils of Venezuelan-driven transactional organized crime.

43.     In December 2019, the U. S. Congress passed the Venezuela Emergency Relief, Democracy Assistance, and Development Act of 2019, officially declaring that the 2018 Venezuelan elections were not legitimate and recognizing the VNA as Venezuela's only democratically elected government.  *See* 22 U.S.C. §§ 9701–03.

44.     Most members of Venezuela's recognized and legitimate government, the VNA, have nonetheless been forced into exile by the Maduro regime, as have most members of the legitimate TSJ that the VNA constitutionally appointed as Venezuela's highest judicial body.

45.     OFAC generally blocks transactions with the Maduro regime as part of the Venezuela Sanction Regulations, 31 C.F.R. part 591.

46.     However, OFAC has given the VNA "general licenses" that create exceptions to the U.S. sanctions blocking Venezuelan government assets, including

CASE NO.

General License No. 42,[11] which authorizes transactions that are "ordinarily incident and necessary to the negotiation of settlement agreements with [the VNA] . . . relating to any debt of the Government of Venezuela."

47.     In effect, OFAC has given the VNA control over assets belonging to Defendant for the express purpose of settling Defendant's debts.  The "General License" No. 42 in part reads:

> (a)     Except as provided in paragraph (b) of this general license, all transactions prohibited by the Venezuelan Sanctions Regulations, 31 CFR part 591 (the VSR), that are ordinarily incident and necessary to the negotiation of settlement agreements with the IV Venezuelan National Assembly seated on January 5, 2016 ('IV National Assembly'), its Delegated Commission,  any entity established by, or under the direction of, the IV National Assembly to exercise its mandate ('IV National Assembly Entity'), or any person appointed or designated by, or whose appointment or designation is retained by, an IV National Assembly Entity, relating to any debt of the Government of Venezuela, Petróleos de Venezuela, S.A. (PdVSA), or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest are authorized.
>
> **Note 1 to paragraph (a)**.  The authorization in paragraph (a) of this general license includes the negotiations of settlement agreements with persons appointed or designated by, or whose appointment or designation is retained by, an IV National Assembly Entity to the board of directors (including any ad hoc boards of directors), or as an executive officer of a Government of Venezuela entity (including entities owned or controlled, directly or indirectly, by the Government of Venezuela).

(Emphasis supplied; bold emphasis in the original.)

---

[11]     Attached as **Exhibit E** is Office of Foreign Assets Control Venezuela Sanctions Regulations 31 CFR part 591, General License No. 42, Authorizing Certain Transactions Related to the Negotiation of Certain Settlement Agreements with the IV Venezuelan National Assembly and Certain Other Person, dated May 1, 2023.

13

48.     By seeking and accepting OFAC general licenses, including License No. 42, for the express purpose of settling and paying its debts with assets in the United States, Defendant has waived sovereign immunity with respect to its debt to Plaintiff.

49.     On March 26, 2020, the U. S. Department of Justice announced that Maduro, other members of the CLS, and corrupt Venezuelan officials had been indicted on narcoterrorism charges, specifically including violations of 21 U.S.C. § 960a and 21 U.S.C. 841(a).

50.     Maduro has never been arrested and continues unlawfully to claim to be the President of Venezuela.  The U. S. government continues to offer $50,000,000 (fifty million dollars) reward for information leading to his arrest and conviction (*see supra,* ¶ 2).

### Plaintiff's Wrongful Imprisonment

51.     As of 2003, Plaintiff was the Vice-President of Finance at Banco Canarias, a bank in Venezuela.  Banco Canarias was a registered foreign exchange dealer.

52.     Plaintiff provided financial support to politicians opposing Venezuela's government, which was at that time controlled by Chávez, Maduro, and the CLS narcotrafficking conspirators.  This financial assistance was in furtherance of nurturing transparency and a democratic process in Venezuelan elections.

53.     Starting in February 2003, the Venezuelan government imposed new foreign exchange controls and directed the Foreign Exchange Administration Commission (*Comisión de Administración de Divisas*) ("CADIVI") —a government body—to manage foreign exchanges.  Entities desiring to acquire foreign currency were required to seek

authorization from CADIVI.  Banco Canarias was authorized to process requests for foreign currency and associated foreign exchange transactions.

54.     In June 2003, another company, using Banco Canarias as an intermediary, petitioned CADIVI to approve the use of United States currency to acquire computers that it asserted had been shipped to Venezuela.  CADIVI approved the currency transaction. That transaction presumably was undertaken by Consorcio Microstar ("Microstar") which asked CADIVI for a substantial sum of U.S. dollars to complete the alleged transaction. The computers presumably were held in customs.  Hence, at the core of the transaction was the averment that the computers had entered Venezuela.  Yet, they never did.

55.     Unbeknownst to Banco Canarias or Plaintiff, the computers were never shipped.   And the invoices that Microstar submitted were fraudulent.  Banco Canarias' only role in this transaction was as an intermediary; it relied on CADIVI to verify and approve foreign exchange transactions.

56.     On November 4, 2003, the Venezuelan Public Prosecution Service (*Ministerio Público*) opened an investigation in connection with the forged invoices.  That investigation allegedly was prompted by a complaint that the National Tax and Customs Superintendent filed regarding the forged documents that Microstar allegedly had submitted to Banco Canarias, its foreign exchange dealer.

57.     On November 29, 2005, the Venezuelan Attorney General's office indicted Plaintiff and falsely accused him of smuggling and tax evasion, while ignoring CADIVI's potential (and actual) involvement in corruption.

58.     Plaintiff applied for the case to be dismissed, pointing out that while CADIVI was legally responsible for approving the transaction, the Attorney General's

CASE NO.

office was ignoring CADIVI's potential involvement in illegal activities. Pursuant to Venezuelan law, CADIVI was the *only* private or public body legally authorized to verify and enable foreign exchange transactions, and foreign exchange dealers were involved only after CADIVI had authorized the transaction.

59. Plaintiff's application was ignored and the Attorney General's office continued the investigation.

60. With CADIVI's potential responsibility for corruption having been totally cast aside and ignored by the Attorney General, Plaintiff filed an appeal (*recurso de avocamiento*) before the Venezuelan Supreme Court.

61. On November 16, 2006, the Supreme Court called for the Public Prosecution Service to investigate all persons potentially involved in the fraudulent transaction rather than focusing exclusively on Plaintiff.

62. Plaintiff's case was referred to a Venezuelan trial court in the Caracas Metropolitan Area (Court No. 3). The case was assigned to a provisional judge who could be removed at any time without cause. The provisional judge refused Plaintiff's application for dismissal of the charges.

63. On February 7, 2007, the Attorney General's office applied to have Plaintiff held in custody pending trial. The basis for the detention was the assertion that the formal indictment had given rise to new charges. In this connection, the Attorney General's office accused Plaintiff of embezzlement for allegedly having illicitly used currency belonging to Banco Canarias to fund Microstar's fraudulent transaction.

64.     The application for a pre-trial detention order stated that Plaintiff illegally had appropriated funds, but lacked particularity and details pertaining to any facts or evidence substantiating wrongdoing under Venezuelan law.

65.     The Attorney General's office suppressed from Court No. 3 and Plaintiff's defense counsel an independent report from the Ministry of the Economy and Finance that proved that the funds at issue in the transaction came from an unrelated third party.

66.     As a result of the false allegations, the Court ordered Plaintiff's detention. On February 8, 2007, Plaintiff voluntarily turned himself in to the authorities.

67.     For almost three (3) years, Plaintiff was held in custody in violation of Venezuelan law.

68.     Through petitions to courts, Plaintiff challenged his detention and also pointed to numerous procedural irregularities and illegalities in the investigation and his trial.

69.     The charges against Plaintiff were at one point dismissed, but the Attorney General's office re-filed them, notwithstanding having received a report from the Ministry of Economy and Finance concluding that the source of the foreign currency was a third party unconnected to Banco Canarias.  This exculpatory information, however, was not made available to the Court or to the defense team.

70.     Judges favorable to Plaintiff were forced to recuse themselves from hearing his case under penalty of removal and incarceration.

71.     On December 10, 2009, an investigative court (Court No. 31) that had been randomly selected to hear Plaintiff's case modified Plaintiff's pretrial detention order,

allowing his release on the condition that he surrender his passport, report to the court every two weeks, and agree not to leave the country.

72.     On December 11, 2009, officers from the Defendant's Intelligence and Prevention Services Directorate learned of the order releasing Plaintiff. The Directorate raided the court, arresting the judge who issued the release order, and her two bailiffs. The judge was taken to the Directorate's headquarters. The next day it was announced that another court had ordered the judge's detention.

73.     Simultaneously, the Defendant's police began searching for and attempting to arrest Plaintiff despite the absence of any court order authorizing his detention.

74.     Plaintiff's defense attorneys were intimidated; one was arrested, questioned, and held by the Military Intelligence Directorate for two days.

75.     Also on December 11, 2009, then-President of Venezuela Chávez addressed Plaintiff's release on a national radio and television program, calling Plaintiff a bandit, insinuating the judge who had released him was corrupt, and claiming Plaintiff's defense attorneys were criminals.

76.     Chávez demanded that the President of the Venezuelan Supreme Court, and National Assembly change the law to allow for the maximum sentence to be imposed on the judge who had ordered Plaintiff's release.

77.     On December 12, 2009, the Attorney General's office indicted the judge who had released Plaintiff from pretrial detention on charges of corruption, assisting an escape, conspiracy, and abuse of power.

78.     On December 18, 2009, with a new judge having taken over Court No. 31 once again issued a warrant for Plaintiff's arrest.

CASE NO.

79.    As a consequence of the government's political persecution, Plaintiff fled, and ultimately moved to the United States and applied for and received political asylum.

80.    In 2011, Plaintiff was granted asylum[12] by an American immigration court in Miami.  He currently resides in Florida.

81.    Despite having been a *de jure* Venezuelan citizen, Plaintiff has been *de jure* deprived of all benefits of Venezuelan citizenship and of citizenship generally, including:

(i)    the right to live in Venezuela (other than in a concentration camp),

(ii)    the right to have a Venezuelan passport,

(iii)    the right to vote in Venezuelan elections,

(iv)    the right to the equitable and fair administration of justice before Venezuelan tribunals, including access to the judicial system,

(v)    the right to own property in Venezuela,

(vi)    the right to rent property in Venezuela,

(vii)    the right to engage in commercial activity (i.e., earn a livelihood) in Venezuela,

(viii)    the right to shelter in Venezuela (other than in a concentration camp),

(ix)    the right to travel beyond Venezuela,

(x)    the right to travel nationally in Venezuela,

(xi)    the right to work (i.e., to earn a livelihood as an employee),

(xii)    the right to participate in any civic or political activity in Venezuela, as well as

(xiii)    national and international ambulatory rights, or

(xiv)    the right to private property in Venezuela.

---

[12]    *See supra* **Exhibit D.**

CASE NO.

**The United Nations Human Rights Committee Ruling**

82.   In 2010, Plaintiff filed a complaint against Venezuela to the United Nations Human Rights Committee, under Art. 5, ¶ 4, of the Optional Protocol to the International Covenant on Civil and Political Rights.

83.   Venezuela was and is a signatory to the Optional Protocol to the ICCPR. As a result, decisions of the UNHRC are binding on Venezuela and have the force of law as to Venezuelan courts.

84.   Plaintiff alleged before the UNHRC that Venezuela had violated his rights under the ICCPR by

(i)     depriving him of adequate due process when accusing him of a crime,

(ii)    unlawfully and arbitrarily detaining him in violation of Venezuelan law,

(iii)   depriving him of effective judicial review of his detention,

(iv)   depriving him of his right to be tried promptly and without delay,

(v)    depriving him of an independent and impartial tribunal, and

(vi)   depriving him of his right to be presumed innocent.

85.   The Attorney General, on behalf of Venezuela, answered Plaintiff's complaint to the UNHRC and defended its actions.   Venezuela's submission was considered by the UNHRC in ruling on Plaintiff's claim.   At all times material to the proceeding, Venezuela was represented by counsel.   Moreover, the following members of the Committee participated in the deliberations leading to the UNHRC's Opinion:

(i)     Mr. Yadh Ben Achour (Republic of Tunisia),

(ii)    Mr. Lazhari Bouzid (People's Democratic Republic of Algeria),

(iii)   Ms. Christine Chanet (French Republic),

(iv)   Mr. Cornelis Flinterman (Kingdom of the Netherlands),

20

CASE NO.

    (v)     Mr. Yuji Iwasawa (Japan),

    (vi)    Mr. Walter Kälin (Swiss Confederation),

    (vii)   Ms. Zonke Zanele Majodina (Republic of South Africa),

    (viii)  Ms. Iulia Antoanella Motoc (Romania),

    (ix)    Mr. Gerald L. Neuman (United States of America),

    (x)     Mr. Michael O'Flaherty (Republic of Ireland),

    (xi)    Mr. Rafael Rivas Posada (Republic of Colombia),

    (xii)   Sir Nigel Rodley (United Kingdom of Great Britain and Northern Ireland),

    (xiii)  Mr. Fabián Omar Salvioli (Argentine Republic),

    (xiv)  Mr. Marat Sarsembayev (Republic of Kazakhstan),

    (xv)   Mr. Krister Thelin (Kingdom of Sweden), and

    (xvi)  Ms. Margo Waterval (Republic of Suriname).

86.    Accordingly, all stakeholders were duly represented and participated in the proceedings giving rise to the UNHRC findings and directive.

87.    On October 29, 2012, the UNHRC issued Communication No. 1940/2010 (UNHRC Opinion), providing its "views" on the merits of Plaintiff's complaint.[13]

88.    The UNHRC Opinion concluded that Venezuela had violated the ICCPR (and therefore Venezuelan law) because the tribunal that oversaw Plaintiff's case was not independent since, among other things, "the arrest of the judge presiding over Court No. 31 suggests a possible link with the wishes of the executive branch, in view of the public statements made by the President of the Republic[.]"

89.    The UNHRC Opinion further concluded that Plaintiff's right to be presumed innocent was not respected by Defendant, in violation of the ICCPR and Venezuelan law, as Plaintiff was detained and denied bail without any judgment having

---

[13]   *See supra* **Exhibit C.**

CASE NO.

been made to his criminal liability, and had nonetheless been denounced as a "bandit" by Maduro.

90.     The UNHRC Opinion found that the proceedings against Plaintiff suffered from undue delay, in violation of the ICCPR and Venezuelan law, and that Venezuela had no adequate explanation for delays in Plaintiff's trial.

91.     Finally, the UNHRC Opinion further held that Venezuela arbitrarily had detained Plaintiff in violation of the ICCPR and Venezuelan law.

92.     The UNHRC Opinion determined that Plaintiff was entitled to, among other remedies, "appropriate compensation" for Venezuela's violations of the ICCPR including for his arbitrary and unlawful detention.   Put simply, the UNHRC Opinion constitutes binding law as to liability in favor of Plaintiff and against Venezuela.

93.     The UNHRC Opinion also held that Venezuela must "publish the present Views and to have them widely disseminated."

94.     Pursuant to Venezuela's constitutional law, a Venezuelan judicial tribunal must accept the UNHRC Opinion.  It has jurisdiction to disavow, modify, or diminish these findings.

95.     Having secured the equivalent of a binding judgment on the question of liability, Plaintiff sought to have a trial on the single issue of damages also pursuant to the UNHRC Opinion's stricture in "[i]n accordance with article 2, paragraph 3(a), of the Covenant, *the State party [Venezuela] is under an obligation to provide the author [Plaintiff in this case] with an effective remedy, including by:  (a) if the author faces trial, ensuring the trial affords all the judicial guarantees provided for in article 14 of the Covenant ...; and (c) providing the author with redress, particularly in the form of*

CASE NO.

*appropriate compensation*.  The State party is also under an obligation to prevent similar violations in the future."  (Emphasis supplied.)

96.     As detailed in the following paragraphs, Plaintiff's award on liability required a corresponding recognition of the quantum of damages suffered.  The UNHRC lacks jurisdiction to quantify damages beyond stating entitlement to damages. Accordingly, Plaintiff turned to the TSJ, Venezuela's highest court, for a trial on the solitary question of damages arising from the human rights violations that constitutes the subject matter of the UNHRC's Opinion.

### The TSJ Rules in Plaintiff's Favor

97.     Unsurprisingly, in the context of the unlawful usurpation of Venezuela's government by the Maduro regime and its narcoterrorist co-conspirators, the UNHRC Opinion commanding that Plaintiff be appropriately compensated was not honored by Venezuela.  Requests for compensation fell on deaf ears.

98.     Thus, on June 23, 2020, Plaintiff took his claim for damages to the Political Administrative Chamber of the TSJ in exile, which as discussed *supra* (¶ 29), was constitutionally appointed by the VNA and is the only continuous lawfully constituted and internationally recognized court of last resort for Venezuela.

99.     Plaintiff was represented in the TSJ proceedings by counsel.  The VNA appointed a Special Prosecutor, who appeared on Venezuela's behalf.

100.    On August 20, 2021, the TSJ ruled that the Special Prosecutor was competent to defend the rights and obligations of Venezuela, notwithstanding the *de facto* control of Venezuela's physical territory by the disavowed and illegitimate Maduro regime.

CASE NO.

101.    Subsequently, the TSJ throughout 2021 and 2022 heard extensive proceedings and evidence regarding Plaintiff's claim for compensation.

102.    On June 13, 2022, a majority of the TSJ, sitting in exile in Doral, Florida issued a decision and judgment in Plaintiff's favor (the "TSJ Judgment").

103.    Specifically, the TSJ ruled that the failure of Venezuela to compensate Plaintiff fairly as ordered by the UNHRC Opinion was in violation of Venezuelan law.

104.    The TSJ further ruled that Plaintiff be awarded the following damages:

    a.    $185,461,994.95 as compensation for consequential damages;

    b.    $532,492,000.00 as compensation for lost profits; and

    c.    $50,000,000 as compensation for moral damages.[14]

105.    Plaintiff tendered multiple demands to the VNA seeking compliance with the UNHRC Opinion's directive to compensate Plaintiff for having suffered human rights violations inflicted by the Maduro regime.   These requests were not acknowledged, let alone addressed.

106.    Most recently on September 8, 2025, Plaintiff again demanded that the VNA in accordance with authorities granted to it by OFAC, compensate Plaintiff for his damages as ordered in the TSJ Judgment.  A true and correct copy of Plaintiff's September 8, 2025 demand letter to the VNA is here attached as **Exhibit F**.

107.    Significantly, in that demand Plaintiff without prejudice to the rights arising from the June 13, 2022 Judgment, in the alternative, offered to participate in an arbitration on the sole issue of damages corresponding to the UNHRC Opinion.

---

[14]    *See supra* **Composite Exhibit A**, damages analysis found on pp. 13 through 34.

CASE NO.

108.   To date the VNA, despite the TSJ's status as the legitimate judicial branch of Venezuela, has failed to comply with the TSJ's Judgment.  Venezuela continues to be unresponsive to Plaintiff's demand.

**Consequences of the Venezuelan National Assembly's Non-Recognition and Non-Compliance with the TSJ's June 13, 2022 Judgment or the United Nations Human Rights Committee Opinion**

109.   The VNA's non-recognition of the TSJ's June 13, 2022 Judgment or of the UNHRC Opinion, would give rise, without limitation, to five (5) scenarios that are not sustainable.

110.   First, by denying Plaintiff his right to compensation arising from the Maduro regime's violation of Plaintiff's human rights, the VNA would be directly and in the light of day supporting the Maduro narco-regime by sheltering them from human rights victims seeking enforcement of judgments arising from the Maduro regime's violation of the judgment creditors' human rights.  Put simply, the VNA would be aiding and abetting the Maduro regime to the detriment of the regime's human rights victims by disregarding the rule of law and turning a blind eye to the UNHRC Opinion, as well as to the Judgment that its very constitutionally appointed Supreme Court issued in favor of Plaintiff and against Defendant.

111.   Thus, the VNA would be acting in unison with its counterpart, the "Constitutional Venezuelan National Assembly" residing within Venezuela's national territory that was unconstitutionally elected pursuant to a corrupt election process. Lamentably, both National Assemblies would be repressing human rights victims and economically bolstering the Maduro regime.

CASE NO.

112.     Second, non-compliance with the UNHRC Opinion or the TSJ's Judgment dated June 13, 2022 undermines the VNA's obligations as an OFAC License holder. OFAC License No. 42 imposes on the VNA the obligation to negotiate and settle claims brought against Defendant Venezuela.  In the instant case, Plaintiff is the beneficiary of the *Views of the United Nations Human Rights Committee under Article 5, ¶ 4 of the Optional Protocol to the International Covenant on Civil and Political Rights*, as well as to the TSJ's June 13, 2022 Judgment, a Judgment issued by the only constitutionally appointed and operational branch of the Venezuelan government.   Accordingly, Plaintiff's claim constitutes an emblematic instance triggering the VNA's obligations under OFAC License No. 42 **(Exhibit E)**.

113.     Third, the VNA's non-recognition of the TSJ's June 13, 2022 Judgment undermines the VNA's own legitimacy and normative standing because the VNA's five-(5) year term, as a matter of Venezuelan constitutional law (Article 192 Venezuelan Constitution), concluded in 2021.   The TSJ's twelve-(12) year term (Venezuelan Constitution Article 164) is still current and stands in sharp relief to the VNA's current unconstitutional and non-democratically elected status as an undisputed matter of law.

114.     The public records establish that on July 21, 2017 the VNA (as currently constituted) elected the TSJ for a twelve- (12) year term expiring in July 2029.  Therefore, it behooves the VNA to support, bolster, and be a part of the *only* Venezuelan government branch that is constitutionally appointed, elected, or currently operational.   Non-recognition of the TSJ's June 13, 2022 Judgment would be tantamount to severing of the VNA's single thread to its own legal-constitutional normative legitimacy and standing post 2021.

115.    Fourth, the VNA's non-recognition of (i) the TSJ's Judgment, and (ii) the UNHRC Opinion place the VNA on equal footing with the Maduro regime's "Constitutional National Assembly" as both bodies would be characterized as defying and impervious to the rule of law.  The VNA under Venezuelan law is bound by TSJ judgments. Similarly, pursuant to Article 5, ¶ 4 of the ICCPR, the VNA is bound by the UNHRC Opinion directing Defendant Venezuela to provide Plaintiff with "appropriate compensation."[15]

116.    Fifth and finally, the VNA's refusal to recognize the TSJ's Judgment and the UNHRC Opinion undermines the United States's support for the VNA as a government that respects and adheres to the rule of law.  It also places the United States in the politically embarrassing and untenable posture of recognizing only a branch of government because the VNA *de facto* (unwittingly) or *de jure* has elected not to recognize the TSJ, even though it lacks the constitutional authority to disavow the TSJ pursuant to the Venezuelan Constitution.

---

[15]    Article 3, (a)-(c), International Covenant on Civil and Political Rights states:

3.    Each State Party to the present Covenant undertakes:
(a) To ensure that any person whose rights or freedoms as herein recognized are violated *shall* have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(c) To ensure that the competent authorities shall enforce such remedies when granted.

(Emphasis supplied.)

CASE NO.

## CAUSES OF ACTION

### COUNT ONE –
### Uniform Out-of-Country Foreign Money-Judgment
### Recognition Act, Fla. Stat. § 55.601 et seq.

117.    Plaintiff hereby incorporates by reference as if fully set forth herein paragraphs 1 through 116, and states:

118.    The TSJ's judgment is an "out-of-country foreign judgment" within the meaning of Fla. Stat. § 55.602(2), as it is a "judgment of a foreign state granting or denying recovery of a sum of money," namely US$767,953,994.95.

119.    The TSJ judgment is final, conclusive, and enforceable against Venezuela under the laws of Venezuela.

120.    The TSJ judgment does not relate to taxes, fines, or other penalties; divorce support, or maintenance; domestic relations; or any other matter outside the scope of the Uniform Out-of-Country Foreign Money-Judgment Recognition Act.

121.    No ground for refusing to recognize the TSJ judgment exists.  The TSJ had both subject-matter jurisdiction and personal jurisdiction over Venezuela.

122.    Venezuela explicitly consented to jurisdiction before the TSJ and fully participated in the case.

123.    The TSJ judgment was not procured by fraud.  Neither the judgment nor the underlying claim for enforcement is repugnant to the public policy of Florida or the United States.  The TSJ judgment does not conflict with any other judgment and no enforceable forum-selection clause is contravened.

124.    The TSJ's judgment was not rendered in circumstances that raise any doubt about the integrity of the court.  The proceedings before the TSJ were compatible with the requirements of due process of law.

28

CASE NO.

125.    Plaintiff is therefore entitled to recognition and enforcement of the TSJ's judgment.

## COUNT TWO –
## Declaratory Judgment

126.    Plaintiff hereby incorporates by reference as if fully set forth herein paragraphs 1 through 116, and states:

127.    An actual controversy exists between Venezuela and the Plaintiff as to the right to recognition and enforcement of the TSJ's judgment and the amount due.

128.    The TSJ's judgment is final, conclusive, and enforceable.

129.    Venezuela has failed to satisfy the judgment.

130.    Pursuant to 28 U.S.C. § 2201, Plaintiff prays for a declaration affirming that the TSJ's judgment is recognizable and enforceable in this Court.

## COUNT THREE –
## Enforcement of Arbitral Award

161.    Plaintiff hereby incorporates by reference as if fully set forth herein paragraphs 1 through 116, and states:

162.    Jurisdiction exists with respect to this claim pursuant to 28 U.S.C. § 1605(a)(6).

163.    Defendant, Venezuela, was and remains a signatory to the ICCPR and the Protocol.  As a signatory to the ICCPR and the Protocol, Defendant agreed to permit the UNHRC to resolve claims by individuals that Defendant had violated their rights under the ICCPR, and agreed to be bound by such resolutions.

164.    Article I of the Protocol provides, in pertinent part, that "[a] State Party to the Covenant that becomes a Party to the present Protocol recognizes the competence of the Committee [i.e., the UNHRC] to receive   and consider communications from

29

CASE NO.

individuals subject to its jurisdiction who claim to be a violation by that State Party of any of the rights set forth in the Covenant."

165.    Articles 2 through 5 of the Protocol set forth the procedure for the UNHRC's consideration and resolution of such claims.

166.    Pursuant to Article 30(4) if the ICCPR, members of the UNHRC are elected at the United Nations Headquarters in New York, NY.  Pursuant to Article 37(3) of the ICCPR, the UNHRC shall normally meet at the United Nations Headquarters in New York or at the United Nations Office in Geneva, Switzerland.  The Protocol's procedures thus contemplate that part, and potentially all, of the dispute resolution process will take place within the United States.

167.    As recognized by the Supreme Court in its June 13, 2022 judgment, and under Articles 23 and 31 of the Venezuelan Constitution, as a party to the ICCPR and the Protocol, Venezuela is legally bound by and required to comply with the UNHRC's decisions pursuant to the Protocol.  (Judgment pp. 10-12; *see also* UNHRC Opinion ¶¶ 9-10 **(Exhibit B)**; ICCPR, Art. 2, ¶ 3).

168.    As most fully set forth in ¶¶ 82 through 96 above, on March 9, 2010 Plaintiff filed a complaint before the UNHRC pursuant to Art. 5, ¶ 4 of the Protocol.

169.    The UNHRC held proceedings with respect to Plaintiff's complaint. Defendant participated in such proceedings and submitted evidence and advanced legal arguments in defense of the human rights violations that Plaintiff averred as to Defendant.

170.    On October 29, 2012, the UNHRC issued its Opinion ("Views") in favor of Plaintiff ("Author" in that proceeding) and against Defendant ("State-Party" in that proceeding).  *See supra* **Exhibit B.**  The UNHRC directed Defendant, among other things,

to meets its "*obligation* to provide the author with an effective remedy, including by …(c) providing the author with redress, particularly in the form of appropriate compensation."

171.    Because the UNHRC's dispute-resolution process is not a judicial proceeding; takes place by consent of both parties; includes a procedure for consideration of the evidence and submissions of both sides; and results in a binding determination, it is a form of arbitration resulting in an arbitral award.

172.    Defendant has not complied with the award in at least two ways.  First despite having been directed to tender effective and appropriate compensation to Plaintiff, Defendant deliberately has failed even to acknowledge that demand was tendered for compliance with the UNHRC award, i.e., Communication No. 1940/2010.

173.    Second, Defendant deliberately has elected to ignore the June 13, 2022 Judgment that the very Supreme Court that the VNA constitutionally appointed on July 21, 2017, issued awarding Plaintiff damages arising from the human rights violation found in the UNHRC Opinion.

174.    Plaintiff pursuant to the UNHRC Opinion is entitled either to (i) payment in recognition and enforcement of the TSJ's June 13, 2022 Judgment, or in the alternative, (ii) a trial on damages.

Wherefore, Plaintiff Eligio Cedeño respectfully requests for this Court to enter a judgment ordering Defendant through the VNA to comply with the UNHRC Opinion by tendering payment for compensatory damages to Plaintiff in satisfaction of the liquidated damages set forth in the TSJ's judgment dated June 13, 2022 or, in the alternative, ordering a trial before the Court on the single issue of damages in connection with the UNHRC

CASE NO.

Opinion's finding on liability, and awarding such further relief including, without limitation, interest and costs, as this Court deems just and appropriate.

## COUNT FOUR –
## Recognition and Enforcement of Foreign Money Judgment

161.    Plaintiff hereby incorporates by reference as if fully set forth herein paragraphs 1 through 115, and states:

162.    Jurisdiction exists with respect to this claim pursuant to 28 U.S.C. § 1605(a)(1).

163.    The TSJ's June 13, 2022 judgment is a judgment of a competent court of a foreign state that grants recovery of a sum of money.  It is final and conclusive and enforceable where rendered.

164.    In the Fifth Decretal Paragraph of its June 13, 2022 judgment, the TSJ waived Defendant's sovereign immunity with respect to recognition and enforcement of the judgment against Defendant's Palermo Convention assets in the United States.

165.    No basis exists for denying recognition and enforcement of the judgment against Venezuela to the extent of its waiver of sovereign immunity.

Wherefore, Plaintiff Eligio Cedeño respectfully requests for this Court to enter a judgment recognizing and enforcing against Defendant the TSJ's June 13, 2022 judgment to the extent of the waiver of Defendant's sovereign immunity.

## PRAYER FOR RELIEF

WHEREFORE, judgment should be entered in favor of Plaintiff and against Venezuela, granting the following relief:

a.   recognition and enforcement of the TSJ's judgment;

32

CASE NO.

    b.   a money judgment of US$767,953,994.95 plus interest, reflecting all principal, interest, and costs awarded by the TSJ, together with all interest accrued on the TSJ judgment since the date thereof;

    c.   all other prejudgment and post-judgment interest provided by law;

    d.   a judgment on all counts in favor of Plaintiff;

    e.   any attorney's fees, litigation expense, or costs that may be recoverable in this proceeding; and

    f.   such other and further relief as may be just and proper.

Dated: October 24, 2025.        Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP


By:  /s/  Pedro J. Martinez-Fraga
      Pedro J. Martinez-Fraga
      Florida Bar No.:   752282
      C. Ryan Reetz
      Florida Bar No.:   934062
      *Counsel for Plaintiff, ELIGIO CEDEÑO*
      200 South Biscayne Blvd., Suite 400
      Miami, Florida  33131
      Tel.:  (786) 322-7500
      Fax:  (786) 322-7473
      Email: pedro.martinezfraga@bclplaw.com
             ryan.reetz@bclplaw.com