**EXHIBIT C**

United Nations

CCPR/C/106/D/1940/2010



# International Covenant on Civil and Political Rights

Distr.: General
4 December 2012
English
Original: Spanish

## Human Rights Committee

### Communication No. 1940/2010

**Views adopted by the Committee at its 106th session (15 October–2 November 2012)**

| | |
|---|---|
| *Submitted by:* | Eligio Cedeño (represented by counsel, Mr. Emilio Berrizbeitia) |
| *Alleged victim:* | The author |
| *State party:* | Bolivarian Republic of Venezuela |
| *Date of communication:* | 9 March 2010 (initial submission) |
| *Document reference:* | Special Rapporteur's rule 92/97 decision, transmitted to the State party on 12 May 2010 (not issued in document form) |
| *Date of adoption of Views:* | 29 October 2012 |
| *Subject matter:* | Conduct of the trial in a criminal case |
| *Procedural issue:* | Domestic remedies unreasonably prolonged |
| *Substantive issues:* | Arbitrary detention; violation of judicial guarantees |
| *Articles of the Covenant:* | 9 and 14, paragraphs 1, 2 and 3 (a), (b) and (c) |
| *Article of the Optional Protocol:* | 5, paragraph 2 (a) and (b) |

[Annex]

GE.12-48461  (E)    111212    131212

Please recycle ♲

CCPR/C/106/D/1940/2010

# Annex

## Views of the Human Rights Committee under article 5, paragraph 4, of the Optional Protocol to the International Covenant on Civil and Political Rights (106th session)

concerning

## Communication No. 1940/2010*

| | |
|---|---|
| *Submitted by:* | Eligio Cedeño (represented by counsel, Mr. Emilio Berrizbeitia) |
| *Alleged victim:* | The author |
| *State party:* | Bolivarian Republic of Venezuela |
| *Date of communication:* | 9 March 2010 (initial submission) |

*The Human Rights Committee*, established under article 28 of the International Covenant on Civil and Political Rights,

*Meeting* on 29 October 2012,

*Having concluded* its consideration of communication No. 1940/2010, submitted to the Human Rights Committee on behalf of Mr. Eligio Cedeño under the Optional Protocol to the International Covenant on Civil and Political Rights,

*Having taken into account* all written information made available to it by the author of the communication and the State party,

*Adopts* the following:

## Views under article 5, paragraph 4, of the Optional Protocol

1. The author of the communication is Mr. Eligio Cedeño, a Venezuelan national born on 1 December 1964. He claims to be the victim of a violation by the Bolivarian Republic of Venezuela of his rights under article 2; article 9, paragraphs 1, 2, 3 and 4; and article 14, paragraphs 1, 2 and 3 (a), (b) and (c), of the Covenant. He is represented by counsel, Mr. Emilio Berrizbeitia.

### The facts as submitted by the author

2.1 The author was a vice-president of finance at Banco Canarias. He claims that he provided financial support to politicians opposing the Venezuelan Government and to leaders and other prominent figures of civil society. Because of this support, he has been a victim of retaliatory action by the Government.

---

\* The following members of the Committee participated in the consideration of the present communication: Mr. Yadh Ben Achour, Mr. Lazhari Bouzid, Ms. Christine Chanet, Mr. Cornelis Flinterman, Mr. Yuji Iwasawa, Mr. Walter Kälin, Ms. Zonke Zanele Majodina, Ms. Iulia Antoanella Motoc, Mr. Gerald L. Neuman, Mr. Michael O'Flaherty, Mr. Rafael Rivas Posada, Sir Nigel Rodley, Mr. Fabian Omar Salvioli, Mr. Marat Sarsembayev, Mr. Krister Thelin and Ms. Margo Waterval.

2.2 In February 2003, the Government introduced strict foreign exchange controls. The exchange rate was fixed by the Central Bank, and the Foreign Exchange Administration Commission (CADIVI) was set up to manage the foreign exchange system. Any entity wishing to acquire foreign currency needed to seek authorization from CADIVI. Banco Canarias was registered as a foreign exchange dealer authorized to handle requests for foreign currency and the associated foreign exchange transactions.

2.3 In June 2003, through the intermediary of Banco Canarias, Consorcio Microstar (hereinafter Microstar) asked CADIVI for a substantial sum of United States dollars to acquire computers that it said had been shipped to the State party and were being held in customs. CADIVI approved the currency transaction without realizing that the computers had never entered the State party and that the invoices submitted by Microstar were falsified.

2.4 On 4 November 2003, the Public Prosecution Service (*Ministerio Público*) opened an investigation in response to a complaint filed by the National Tax and Customs Superintendent in relation to the forged documents that Microstar had allegedly submitted to Banco Canarias, its foreign exchange dealer. On 29 November 2005, the author was indicted by the Attorney-General's Office (*Fiscalía General*) on charges of smuggling by simulating the importation of goods and tax evasion. The author applied for the case to be dismissed on the grounds that the acts in question could not be attributed to him; under Venezuelan law, CADIVI was the only body legally empowered to verify and authorize foreign exchange transactions, and foreign exchange dealers were involved only after CADIVI had given authorization. His application was ignored and the Attorney-General's Office continued with the investigation. Subsequently, because his application for dismissal had not been granted and CADIVI's possible responsibility was being totally ignored in the criminal investigations, the author filed a request for cognizance (*recurso de avocamiento*) before the Supreme Court. On 16 November 2006, the Supreme Court called for the Public Prosecution Service to investigate all persons who might have been involved in the events at the root of the alleged offences. The case was referred to the third trial court of first instance of the criminal court circuit of Caracas Metropolitan Area (Court No. 3), where it was assigned to a provisional judge. The provisional judge refused the author's application for dismissal and the Public Prosecution Service continued the investigation without considering the potential responsibility of CADIVI. Both the judge and the prosecutors were provisional, and could therefore be removed at any time without any disciplinary proceedings.

2.5 On 7 February 2007, the Attorney-General's Office applied to Court No. 3 for the author's pretrial detention, on the grounds that the investigations conducted since the formal indictment had brought a new offence to light. The Attorney-General's Office accused the author of embezzlement, for having improperly used currency belonging to Banco Canarias to fund the Microstar transaction. The author maintains that Banco Canarias never filed any complaint about this and that the charge did not appear in the initial indictment. The application for a pretrial detention order stated that the author had illegally appropriated funds but did not include a detailed description of any facts or evidence attesting to an offence having been committed. On 8 February 2007, the author voluntarily presented himself to the authorities. Given that the charge was embezzlement and that Banco Canarias clients had apparently suffered severe losses as a result, the judge presiding over Court No. 3 argued that there was a risk of the author attempting to abscond or obstruct the course of justice. Since he was known to have considerable financial resources and was the owner of an aircraft, she ordered that he be placed in pretrial detention. The legal prerequisites that must be met prior to the adoption of such a measure were ignored, as was the fact that the author was already banned from leaving the country. The author appealed against the pretrial detention order. On 13 March 2007, the Appeal Court dismissed the author's appeal. Subsequently, the Attorney-General's Office received

CCPR/C/106/D/1940/2010

a report from the Ministry of the Economy and Finance which concluded that the source of the foreign currency was a third party unconnected to Banco Canarias. However, the Office did not make this information available either to the Court or to the defence team. In addition, on 16 March 2007, Court No. 3 refused the author's request to review his file in person and ascertain the scope of the charges and allegations against him.

2.6   On 26 March 2007, the Attorney-General's Office filed a formal accusation against the author before Court No. 3 on charges of embezzlement and complicity in smuggling by simulating the importation of goods. A further written accusation against the author was subsequently filed, on 20 April 2007, adding a third charge of complicity in the fraudulent acquisition of foreign currency. At the preliminary hearing on 9 May 2007, the formal accusation presented by the Attorney-General's Office was imprecise and did not meet the legal prerequisites. Nonetheless, the judge admitted almost all the evidence presented by the Attorney-General's Office and disallowed the documentary evidence offered by the author, admitting the testimony of only 2 of the 15 witnesses proposed by him. This decision was appealed without success. The author claims that the judge was promoted as a result of the bias she showed and at the time of the communication's submission was the presiding circuit judge of the criminal court circuit of the Caracas Metropolitan Area.

2.7   At the preliminary stage of the trial in June 2007, the Attorney-General's Office sought to recuse the first two judges who had been assigned to the case at random. Although the recusal motion was denied, the judges subsequently recused themselves due to external pressures. One of them received a letter from the President of the Supreme Court in which it was suggested that, if he did not recuse himself, he would be immediately dismissed. The recusal of a third judge, due to her friendship with one of the prosecutors, was accepted by the Appeal Court on 2 October 2007.

2.8   On 20 November 2007, the author petitioned the Supreme Court to declare the detention order, the preliminary hearing and the trial null and void and to order his release on the grounds that he had not been properly indicted on the embezzlement charge on which the application for a detention order had been based (request for cognizance).

2.9   The oral proceedings began on 31 March 2008. After the evidence had been presented and the hearing of the closing arguments had been scheduled for 9 June 2008, without explanation the prosecution team failed to turn up.

2.10   On 17 December 2008, the Attorney-General's Office requested a 2-year extension of the period of pretrial detention without providing reasons to substantiate the request.

2.11   In March 2009, the author's lawyers submitted the case to the United Nations Working Group on Arbitrary Detention and the Special Rapporteur on the independence of judges and lawyers.

2.12   On 18 March 2009, the Supreme Court issued Decision No. 2009-0008, announcing a comprehensive reorganization of the judiciary over a period of one year and authorizing the Judicial Commission to suspend, with or without pay, judges and administrative staff who did not pass the institutional evaluation, and to fill the positions that thus became vacant. The decision did not establish any evaluation criteria.

2.13   On 7 May 2009, the Supreme Court found that the author was never properly indicted on the embezzlement charge and that his right to be included in the corresponding investigation had been curtailed, in violation of his right to a defence, his right to be heard and his right to be presumed innocent, in that the Attorney-General's Office did not inform him that a new offence had come to light and failed to summon him to give a statement. It therefore declared the entire proceedings null and void, causing the trial to revert to the preliminary phase, and granted the Attorney-General's Office 30 days to issue a new indictment against the author. However, it did not order the author's release. On 26 and 27

May 2009, the Attorney-General's Office charged the author with embezzling Banco Canarias funds, without alleging any new facts, and requested an extension of the author's pretrial detention. On 4 June 2009, the twenty-seventh criminal trial court of first instance of the Caracas Metropolitan Area (Court No. 27) heard the new charge. Court No. 27 added a further 2 years to the maximum allowable period of pretrial detention on the grounds that the case file was large and complex. On 18 June 2009, the Attorney-General's Office formally indicted the author on the charge of embezzlement. The author claims that the Court should have ruled that the new indictment against him was filed after the time limit, based on the deadline set for this purpose in the Supreme Court's judgement, as he had requested on 11 June 2009.

2.14   On 1 September 2009, the Working Group on Arbitrary Detention issued Opinion No. 10/2009.[1] In the absence of a response from the State party, the Working Group found that the proceedings against the author had stalled for a lengthy period as a result of inaction on the part of the Counsel-General's Office (*Procuraduría General*) and that the author's pretrial detention, which exceeded the maximum term established under Venezuelan law, and the refusal to grant bail, even though there was no reason to believe that the author was seeking to evade justice, constituted violations of articles 9, 10 and 11 of the Universal Declaration of Human Rights and articles 9, 10 and 14 of the International Covenant on Civil and Political Rights, and that his detention was therefore arbitrary. The Working Group on Arbitrary Detention asked the State party to release the author on bail until the end of the trial and to take measures to ensure that the proceedings did not suffer further undue delays.

2.15   On 8 October 2009, the Appeal Court amended the decision of Court No. 27, reducing the extension of the period of pretrial detention to 8 months. These 8 months were to be counted from the date of completion of the initial 2-year period, i.e. from 8 February 2009, and therefore ended on the date of the Appeal Court's decision. Nonetheless, the Court failed to order the author's release. The case was subsequently transferred to the thirty-ninth criminal trial court of first instance of the Caracas Metropolitan Area (Court No. 39), which omitted to order the author's release despite applications from his defence. The author responded to this omission by filing a habeas corpus petition. On 15 October 2009, the Attorney-General's Office asked the Appeal Court to clarify the point in time from which the 8-month extension to the period of pretrial detention should be counted. At the same time, it filed an application for *amparo* before the Constitutional Chamber of the Supreme Court, alleging a violation of the constitutional rights of the prosecutor on the grounds that the Appeal Court had exceeded its jurisdiction and arbitrarily altered the length of the extension of the pretrial detention period without giving the parties the opportunity to make submissions on the subject. On 20 October 2009, the Supreme Court admitted the *amparo* application and ordered the effects of the Appeal Court's judgement to be suspended. At the same time, the Court clarified that the extension of the period of pretrial detention should be counted from the date on which the clarification was published. The clarification effectively altered the decision of 8 October 2009, in violation of the res judicata principle. The Appeal Court judge who issued the first judgement and disagreed with the clarifying judgement was subsequently demoted to the position of first-instance judge.

2.16   Subsequently, the thirty-first "control court" of first instance (the court responsible for the investigative and preliminary phases) of the criminal judicial circuit of the Caracas Metropolitan Area (Court No. 31) was selected at random to hear the case against the author. On 10 December 2009, in view of the opinion of the Working Group on Arbitrary

---

[1]   A/HRC/13/30/Add.1.

Detention, the absence of any risk of flight and the failure of the prosecution to appear on two consecutive occasions, the judge modified the precautionary measure of pretrial detention, ordering the author's release on condition that he report to the court every two weeks and did not leave the country, and ordering him to relinquish his passport.

2.17 Having learned of this measure and of the author's release, officers of the Intelligence and Prevention Services Directorate raided Court No. 31 and arrested all those present without a warrant, including the judge, Ms. M.L.A., and two bailiffs. The judge was taken to the Directorate's headquarters. On 11 December 2009, it was reported that an order for the judge's detention had been issued by the first control court of the criminal judicial circuit of the Caracas Metropolitan Area. At the same time, the police attempted to find and detain the author even though they had no court order. The author's defence lawyers were subjected to intimidation. One of them was arrested and taken to the headquarters of the Military Intelligence Directorate where he was questioned for two days. On 11 December 2009, the President of the Republic referred to the author's case in a radio and television programme on a national channel, calling him a "bandit" and accusing him of having "fled". He also referred to the judge as a "bandit", insinuated that she was corrupt and called for her to be sentenced to 30 years' imprisonment. He stated that the lawyers defending the author had committed an offence in allegedly preparing in advance the decision issued by the judge. Lastly, he called for the President of the Supreme Court and the National Assembly to make the legislative amendments necessary to allow for the maximum sentence to be imposed upon the judge.

2.18 On 12 December 2009, the Attorney-General's Office indicted Judge M.L.A. before Control Court No. 50 on charges of corruption, assisting an escape, conspiracy and abuse of power.

2.19 On 16 December 2009, the Chairperson of the Working Group on Arbitrary Detention, the Special Rapporteur on the independence of judges and lawyers and the Special Rapporteur on the situation of human rights defenders issued a joint press release concerning the detention of Judge M.L.A., in which they made reference to the author's arbitrary detention and expressed fear that his defence lawyers could be facing imminent arrest.

2.20 On 18 December 2009, with a new provisional judge now presiding, Court No. 31 revoked the summons to appear in court issued to the author, since he had failed to do so, and issued a warrant for his arrest. Because of the grave risks he was facing, the author felt that he had no choice but to flee the country. At the time of the communication's submission, he was in the United States, where he had submitted an asylum application. On 28 December 2009, the Supreme Court upheld an application from the Attorney-General's Office for the author's extradition.

**The complaint**

3.1 The author claims that the State party violated its obligations under article 2; article 9, paragraphs 1, 2, 3 and 4; and article 14, paragraphs 1, 2 and 3 (a), (b) and (c), of the Covenant.

3.2 His detention and the proceedings against him were in violation of article 9, paragraph 2, and article 14, paragraph 3 (a). The Attorney-General's Office did not properly inform him of the nature of the charges against him and changed the charges when issuing the formal accusation without previously informing him. Thus, when the Attorney-General's Office applied for the author's pretrial detention on the charge of embezzlement, he had not previously been indicted for this offence. In addition, the application for pretrial detention and the formal accusation contained only a general statement indicating that the author had unlawfully appropriated funds, but lacked a detailed description of the facts and

an explanation of how they met the criteria necessary to constitute an offence. Accordingly, the author was denied the opportunity to understand the charges or the facts that supposedly substantiated the alleged offence. Furthermore, on 16 March 2007, Court No. 3 refused the author's request to review his file in person and ascertain the scope of the charges and allegations.

3.3   In relation to article 9, paragraphs 1 and 3, the author alleges that his detention was arbitrary. The detention order issued by Court No. 3 was based on the commission of an offence for which the author had not been indicted. It did not take account of the fact that the author had voluntarily presented himself to the authorities, his ties with the country — where his businesses, his home and his family were located — or the fact that he was already banned from travelling abroad. It also failed to demonstrate that he might interfere in the investigation or flee the country. He was not released on 9 February 2009 upon completion of the 2-year maximum period of pretrial detention permitted under article 244 of the Code of Criminal Procedure. His detention was extended despite the fact that the Attorney-General's request for extension was submitted after the time limit and failed to provide any evidence that might demonstrate the existence of substantive grounds. The author recalls that pretrial detention cannot be used in expectation of a conviction and that its use should be restricted to cases where there is a need to prevent suspects from obstructing the investigations or attempting to evade justice.

3.4   The author did not have access to a timely judicial review of his detention, as required under article 9, paragraph 4, of the Covenant, since his application for release on the grounds that his detention was based on an offence for which he had not been indicted was submitted to the Supreme Court on 20 November 2007 but was not resolved until 7 May 2009, i.e. nearly 18 months later. Although the Supreme Court found that the application was admissible, it did not order the author's release. Furthermore, even if the pretrial detention had been lawful, the author should have been released on 8 February 2009, after completing the maximum 2 years in detention permitted by law. He maintains that in any case, irrespective of its legality under domestic legislation, detention must not be arbitrary, i.e. the period of detention cannot exceed the time reasonably required to achieve the end pursued.

3.5   In relation to article 9, paragraph 3, and article 14, paragraph 3 (c), the author was not tried promptly and without delay. He was placed in pretrial detention on 8 February 2007. Two years and 10 months later, the trial was still in the preliminary phase. The considerable delays in the proceedings were attributable to the conduct of the Attorney-General's Office and were a reflection of deliberate delaying tactics on its part. On 7 May 2009, the Supreme Court considered the application for release submitted by the author almost 18 months earlier, established that he had not been properly indicted and, accordingly, declared the indictment and all subsequent proceedings null and void. The trial was restarted on the basis of a new indictment submitted by the Attorney-General's Office on 26 or 28 May 2009. The Supreme Court's decision was untimely and inopportune since all the evidence had already been heard in the regular proceedings originally suspended on 17 June 2008, whereas the appeal ruled on by the Supreme Court concerned the challenge to the pretrial detention order only, and this issue would have been resolved if the Supreme Court had allowed the trial to conclude. Finally, on 17 December 2008, the Attorney-General's Office requested the extension of the pretrial detention without providing reasons to substantiate its request.

3.6   The courts that heard the case against the author lack independence and impartiality, as required under article 14, paragraph 1, of the Covenant. The State party's system of provisional judges is in violation of the right to an independent judiciary since these judges are not secure in their positions and may be removed at will without any predefined procedure. Since 1999 the executive branch has openly intervened in the administration of

justice, turning the system into an instrument for persecuting political opponents. Provisional judges and prosecutors who take decisions that are contrary to the wishes of the political powers-that-be are arbitrarily relieved of their duties and in many cases subjected to disciplinary proceedings. In contrast, those who act according to instructions are promoted to senior positions. Two of the judges who presided over the proceedings against the author were provisional, meaning that they could be removed at will for political reasons.[2] The judge hearing the case before Court No. 13 who replaced the pretrial detention order with a summons to report regularly to the court was subjected to retaliatory action on the part of the executive branch that was encouraged by the President of the State Party and resulted in her immediate arrest and prosecution. At the time of the communication's submission, the judge was being held in pretrial detention.[3]

3.7     The judges did not act impartially. In November 2005, the judge hearing the case before Court No. 3 indicted the author on charges of smuggling by simulating the importation of goods and tax evasion, even though legislation absolved him of any criminal liability, as the manager of a bank acting as a foreign exchange dealer. The same judge ordered his pretrial detention even though detention was requested on the basis of an alleged offence for which he had not been indicted and there was no risk of flight. On 16 March 2007, the judge refused his request to have personal access to the file so that he could review it with his lawyers. On 9 May 2007, the judge held a preliminary hearing at which all the evidence presented by the Attorney-General's Office was allowed and almost all the documentary evidence presented by the defence was disallowed. On 24 September 2007, after taking cognizance of the case and taking decisions on it, the control judge of Court No. 27 asked to be recused because she was a good friend of the prosecutor representing the Public Prosecution Service. However, the same judge was reassigned to the author's case on 4 June 2009 and extended his pretrial detention for a further 2 years even though the extension was unfounded and unlawful, the only basis for the decision being the fact that the case file was so large. Furthermore, the judge did not take account of the fact that the Attorney-General's Office had submitted the extension request late, i.e. after the 30-day time limit set by the Supreme Court.

3.8     With regard to the right to have adequate time and facilities for the preparation of his defence, in accordance with article 14, paragraph 3 (b), of the Covenant, it is claimed that the author and his lawyers did not have full access to the file. On 16 March 2007, Court No. 3 refused his request to review the file and refused to admit the documentary evidence submitted by his defence, even though the documents in question proved conclusively that the local currency used in the Microstar transaction came from independent sources and was not the fruit of embezzling Banco Canarias funds. His lawyers were prevented from reviewing the full case file. On the grounds that they constituted information pertinent to the defence of the State party, the Attorney-General's Office unlawfully withheld official communications sent by the Ministry of the Economy and Finance and failed to inform the author of them in a timely manner. These communications confirmed that the Venezuelan currency used to fund the Microstar transaction consisted of negotiable instruments

---

[2] The author refers to the case law of the Inter-American Court of Human Rights, *Apitz Barbera et al. ("First Court of Administrative Disputes") v. Venezuela*, Judgement of 5 August 2008, and *Reverón Trujillo v. Venezuela*, Judgment of 30 June 2009, in which the Court found that from August 1999 and up to the present, provisional judges were not secure in their positions, their appointment was discretionary and they could be removed at will without any predefined procedure.

[3] The author claims that, because of Supreme Court Decision No. 2009-0008, of 18 March 2009, announcing the reorganization of the judiciary, if the trial had recommenced, the independence of the courts could not have been guaranteed even if the judges were tenured.

provided by third parties and that the author could not therefore have embezzled funds from Banco Canarias to finance the transaction.

3.9     The right to be presumed innocent, established in article 14, paragraph 2, of the Covenant, was not respected during the proceedings against the author. The author was denied the possibility of being tried while at liberty and was held in pretrial detention even though none of the legal requirements for such a measure were satisfied in his case. He was not released at the end of the 2-year maximum term of pretrial detention. Nor was the detention order revoked on 7 May 2009, when the Supreme Court agreed that the author had not been properly indicted and, on this basis, declared the earlier decisions to be null and void. On 4 June 2009, the pretrial detention order was extended, allowing for the author to be held for a further 2 years. Furthermore, the proceedings against the author were guided by the political motivations of the executive branch, as was clearly demonstrated when the President of the Republic referred to the case on television and radio on 11 December 2009.

3.10    ==The alleged violations of articles 9 and 14 of the Covenant through acts and omissions of the State authorities also constitute a violation of article 2 of the Covenant.==

3.11    With regard to the exhaustion of domestic remedies, the author maintains that, at the time of the communication's submission to the Committee, almost four years after the indictment issued by the Attorney-General's Office in 2005, the trial had still not reached the preliminary hearing stage and that, consequently, he had been neither tried nor convicted at first instance. Thus, the proceedings initiated against him in the Venezuelan courts were unreasonably prolonged, especially given that he was kept in pretrial detention for the entire period. He maintains that the prolongation of the proceedings in his case can be justified neither by its complexity nor by the defence's action in availing itself of the legal remedies available.

3.12    The same matter is not being examined under another procedure of international investigation or settlement. The author affirms that, in view of their legal status, the opinion issued by the Working Group on Arbitrary Detention, its request for the author to be tried while at liberty in accordance with the rules of due process, and the press releases and letters from the Special Rapporteur on the independence of judges and lawyers and the Special Rapporteur on the situation of human rights defenders do not constitute a procedure of investigation within the meaning of article 5, paragraph 2 (a), of the Optional Protocol. Accordingly, they are not incompatible with a decision of the Committee and do not involve a duplication of international procedures.

**State party's observations on admissibility and on the merits**

4.1     On 27 April 2012, the State party submitted its observations on admissibility and on the merits to the Committee, on the basis of an updated report from the Public Prosecution Service dated 9 October 2009, which had been prepared at the request of the Working Group on Arbitrary Detention.

4.2     The State party reports on the actions of prosecutors and the courts in the investigation, indictment and trial of the author for aggravated fraudulent acquisition of foreign currency, embezzlement and complicity in smuggling. It maintains that the Public Prosecution Service investigated and indicted the author for embezzlement because, in an operation involving Microstar, he, as vice-president of Banco Canarias, misappropriated several million dollars from deposits held by the Central Bank. This money, after several transactions, ended up in a foreign bank account in the name of Cedel International Investment, a company whose shareholders included his brother and Banco Canarias, in which the author held shares. In his applications to the Central Bank, the author solemnly

declared that Microstar had met all the legal requirements for processing financial transactions. The Central Bank therefore acted with trust in the author's statements.

4.3 The author's right to a defence was not restricted. He and his defence counsel had access to the documents relating to the proceedings from the beginning of the investigation in 2003 and throughout the proceedings.

4.4 The most serious of the crimes of which the author was accused carries a maximum prison sentence of over 10 years, so that, under article 251, paragraph 1, of the Code of Criminal Procedure, there is a statutory presumption of flight risk, which means that the Public Prosecution Service was obliged to apply for a pretrial detention order. Moreover, the author had the financial resources to leave the country at any time. Given his financial situation and his connections with financial institutions, he could have persuaded his fellow suspects, witnesses, victims or experts to give false testimony in court. The author exercised his right to appeal against the decision by Court No. 39 to extend his pretrial detention, but this decision was upheld by the Appeal Court on 13 May 2007.

4.5 On 7 May 2009, the Supreme Court allowed the author's request for cognizance in relation to the charge of embezzlement and declared null and void the proceedings related to that crime on the grounds that he had not been properly charged. However, it maintained the effects of the indictment of 26 March 2007 on charges of fraudulent acquisition of foreign currency and smuggling by simulating the importation of goods, as well as the pretrial detention order. The author's appeal against the order was rejected by the Appeal Court on 13 March 2007. The extension of the author's pretrial detention by 2 years was requested by the Public Prosecution Service under article 244 of the Code of Criminal Procedure and was granted by Court No. 27 on 4 June 2009. The action of the Supreme Court demonstrates its respect for judicial guarantees and shows that the author's rights were not infringed, especially since, contrary to the court's finding, the author was informed by the Attorney-General's Office that the investigation into him covered the alleged offence of embezzlement, as is clear from the record of the preliminary hearing held by Court No. 3 on 9 February 2007.

4.6 With regard to the courts' alleged lack of impartiality, the State party indicates that, by law, the same control court decides on the admissibility of the charges, admits the evidence and issues the order for a trial. However, this does not imply any conclusive evaluation of either the evidence or the accused's criminal liability. Thus the right to be tried by an impartial tribunal is not affected.

4.7 The delay in the proceedings was due to the interruption of the oral proceedings after the decision on the author's request for cognizance by a higher court, since all proceedings prior to that decision were nullified and a new trial had to begin. In his defence, the author filed every possible ordinary or special appeal against the decisions taken in the course of the proceedings. For example, the preliminary hearings scheduled by Court No. 3 for 9 May and 7 June 2007 were postponed at his request. He filed four appeals in 2009: one against the charges brought by the Public Prosecution Service, on the grounds that they were untimely; one against the decision to extend his pretrial detention; one against the ruling that his objection to the control judge was inadmissible; and one against the order to freeze his assets.

4.8 On 4 November 2009, Mr. G.A., a co-defendant who was accused of being an accessory to the crime of embezzlement, was convicted by court No. 39 to 6 years' imprisonment. He admitted the charges brought by the Attorney-General's Office. His conviction directly implicated the author in the crime, since the complexity of the fraudulent financial transactions meant that the author, as well as CADIVI officials, must have been involved.

4.9     On 20 October 2009, the Supreme Court admitted the application for *amparo* submitted by the Attorney-General's Office on 15 October 2009, in relation to the Appeal Court's decision to reduce the extension of pretrial detention to 8 months. This meant that the effects of that decision were suspended, and the Supreme Court ordered the court of first instance hearing the main case to refrain from taking any action to execute the decision pending the outcome of the application for *amparo*. However, Court No. 31, under Judge M.L.A., ignored the express order of the Supreme Court and unlawfully modified the pretrial detention order, replacing it with a decision to release the author, in a hearing at which the prosecution was not represented.

**Author's comments on the State party's submission**

5.1     On 22 May 2012, the author submitted his comments on the State party's submission. He points out that the State party's submission consisted of a report prepared for the Working Group on Arbitrary Detention and did not mention the information submitted to the Committee by the author, and that it basically addressed the author's possible criminal liability even though this point is not under consideration. He also maintains that, since the State party did not object to the admissibility of the communication, it should be assumed that the State party accepted that it was admissible.

5.2     With regard to the alleged violations of articles 9, paragraph 3, and 14, paragraph 3 (c), he reiterates that his trial was prolonged beyond a reasonable period of time and that this delay cannot be explained solely by the complexity of the case or investigation; that it cannot be attributed to the author; and that the State party has not explained how the right to a trial within a reasonable time was observed in the proceedings. In particular, he argues that in the year and a half it took the Supreme Court to hear his request for cognizance, which was admitted on 17 June 2008, the criminal proceedings against him were suspended, with no judge to officiate over them or monitor his detention. Moreover, the first paragraph of article 251 of the Code of Criminal Procedure violates article 9, paragraph 3, of the Covenant and the principle that pretrial detention should be the exception not the rule, in that it establishes the general assumption that there is a risk of flight in the case of any crime that carries a prison sentence of 10 years or more. In any case, his detention was arbitrary in that, for the detention order to be carried out, the requirements of article 250 of the Code of Criminal Procedure had to be satisfied, namely, there must be well-founded evidence of involvement in a crime. In his case, no evidence was produced that would justify his detention.

5.3     The decision of 10 December 2009, which changed the pretrial detention order to a summons, was lawful. A request to modify a pretrial detention order is not subject to the requirements and formalities of a preliminary hearing and can be heard without having a representative of the prosecution present or holding a hearing. The judge's decision was handed down in accordance with article 264 of the Code of Criminal Procedure, which provides for a review of the need for a custodial measure and the possible replacement of that measure with a less oppressive measure where there has been a change in the circumstances that originally justified the custodial measure. Moreover, the judge based her decision on the fact that the detention had been declared arbitrary by the Working Group on Arbitrary Detention.

5.4     The author claims that the international arrest warrant requested by the State party from INTERPOL in respect of a group of bankers that included the author was subsequently withdrawn by the latter under article 3 of its Constitution and General Regulations, on the grounds that the request was politically motivated.

### Issues and proceedings before the Committee

*Consideration of admissibility*

6.1 Before considering any claim contained in a communication, the Human Rights Committee must decide, in accordance with rule 93 of its rules of procedure, whether the communication is admissible under the Optional Protocol to the Covenant.

6.2 Under article 5, paragraph 2 (a), of the Optional Protocol, the Committee must ascertain that the same matter is not being examined under another procedure of international investigation or settlement. The Committee notes that in its Opinion No. 10/2009, adopted on 1 September 2009, the Working Group on Arbitrary Detention found the detention of the author to be arbitrary. The Committee recalls its jurisprudence to the effect that article 5, paragraph 2 (a), of the Optional Protocol applies only when the same matter that is before the Committee is being examined under another procedure of international investigation or settlement. As the Working Group on Arbitrary Detention had already concluded its consideration of the case before the present communication was submitted to the Committee, the Committee will not address the issue of whether consideration of a case by the Working Group is "another procedure of international investigation or settlement" under article 5, paragraph 2 (a), of the Optional Protocol. Consequently, the Committee considers that there are no obstacles to the admissibility of the communication under article 5, paragraph 2 (b), of the Optional Protocol.

6.3 As for the exhaustion of domestic remedies, the Committee notes that the complaints submitted by the author under articles 9 and 14 of the Covenant relate to the proceedings against him, which have been in the investigation phase since the author was indicted by the Attorney-General's Office in 2005. Since the issue of the exhaustion of domestic remedies is intimately linked to the substantive issues, the Committee considers that article 5, paragraph 2 (b), of the Optional Protocol is not an obstacle to the admissibility of the communication.

6.4 The Committee takes note of the author's allegations concerning article 14, paragraph 3 (a) of the Covenant that he was not promptly informed of the charges of which he had been accused and that the formal indictment issued by the Attorney-General's Office before Court No. 3 did not give details of the charges against him. He also claims that the second indictment by the Attorney-General's Office, for embezzlement, on 26 and 27 May 2009 — i.e. after the judge had declared the entire proceedings up to that point null and void — suffered from the same lack of detail and contained no new facts. The Committee notes that the author challenged the legality of these acts before the courts and that as a result, on 7 May 2009 the Supreme Court ruled that the author had not been properly charged for embezzlement and annulled the proceedings related to this offence. In view of this decision, the Committee considers that the author's complaint was properly dealt with by the authorities of the State party and that, consequently, his submission to the Committee is unfounded. The Committee therefore considers that this complaint is inadmissible under article 2 of the Optional Protocol.

6.5 With regard to the right to have adequate time and facilities for the preparation of his defence (art. 14, para. 3 (b)), the Committee takes note of the following allegations made by the author: that on 16 March 2007 Court No. 3 refused his request to review his file in person; that he was not charged in due form with the offence of embezzlement, in violation of his right to a defence; that the Attorney-General's Office did not make available to the court or the author a report it had received from the Ministry of the Economy and Finance which apparently concluded that the source of the foreign currency was a third party unconnected to Banco Canarias; and that his lawyers did not have full access to the documentation needed for his defence. Nevertheless, the Committee considers that the author, who had legal assistance throughout, has not provided detailed information on how

the preparation of his defence was obstructed or hindered and how access was denied to decisive evidence. Consequently, the Committee considers that this complaint has not been sufficiently substantiated for the purposes of admissibility either, and declares that it too is inadmissible under article 2 of the Optional Protocol.

6.6     The Committee considers, therefore, that the author has sufficiently substantiated his claims under articles 9 and 14 paragraphs 1, 2 and 3 (c) of the Covenant, for the purposes of admissibility. The other admissibility requirements having been met, the Committee considers the communication admissible and proceeds to its examination on the merits.

*Consideration of the merits*

7.1     The Human Rights Committee has considered the present communication in the light of all the information made available to it by the parties, as required under article 5, paragraph 1, of the Optional Protocol.

7.2     With regard to the allegations in respect of article 14, paragraph 1, of the Covenant, the Committee notes that, according to the author, the judicial authorities who heard the case were not independent because the State party has imposed a system of provisional judges who are not secure in their positions and who can be removed at will without any predefined procedure; and that those who do not follow instructions from the executive branch are subject to reprisals. The Committee also takes note of the author's claims that the judges and prosecutors in his case were provisional, and that the judge presiding over Court No. 31, Ms. M.L.A., who ordered his release, acted in accordance with the law and, in retaliation, was arrested without a warrant immediately after doing so. The Committee also takes note of the State party's arguments that the judicial authorities responded to the author's appeals, such as his request for cognizance by a higher court, and that the judge presiding over Court No. 31 was arrested for defying the Supreme Court order which, in the context of the application for *amparo* submitted by the Public Prosecution Service on 15 October 2009, suspended the effects of the judgement reducing the extension of the pretrial detention to 8 months.

7.3     The Committee notes that the State party does not contest the provisional status of the judicial authorities involved in the proceedings against the author. The Committee also notes that the judge presiding over Court No. 31 was arrested on the same day as she ordered the release of the author and that on the following day the President of the Republic referred to her in the media as a "bandit" and suggested that she should be severely punished. The Committee recalls that States should take specific measures to guarantee the independence of the judiciary, protect judges from any form of political influence, and establish clear procedures and objective criteria for the appointment, remuneration, tenure, promotion, suspension and dismissal of the members of the judiciary and for disciplinary sanctions against them. A situation where the functions and competencies of the judiciary and the executive branch are not clearly distinguishable or where the latter is able to control or direct the former is incompatible with the notion of an independent tribunal.[4] The Committee finds that the arrest of the judge presiding over Court No. 31 suggests a possible link with the wishes of the executive branch, in view of the public statements made by the President of the Republic in relation to the arrest, especially as the grounds for modifying the author's detention order referred to the opinion of the Working Group on Arbitrary Detention. In view of this, together with the provisional nature of the judicial authorities involved in the proceedings against the author, the Committee concludes that in the case at

---

[4] See the Committee's general comment No. 32 (2007) on the right to equality before the courts and to a fair trial (*Official Records of the General Assembly, Sixty-second Session, Supplement No. 40*, vol. I [A/62/40 (Vol.I)] Annex VI), para. 19.

hand the State party violated the independence of the judicial bodies involved and article 14, paragraph 1, of the Covenant.

7.4   With regard to the possible violation of article 14, paragraph 2, the Committee notes the author's claim that his right to be presumed innocent was not respected, since he was deprived of his liberty as a preventive measure even though none of the legal requirements for this action were satisfied, and that the proceedings against him were politically motivated. The Committee also notes that, after the author's release had been ordered, the President of the Republic called him a "bandit" on national radio and television and insinuated that his release had been illegally coordinated by his lawyers and the judge presiding over Court No. 31. The Committee has received no refutation or explanation of the President's statements from the State party. In this connection, the Committee recalls that the denial of bail does not affect the presumption of innocence. In general, all public authorities have a duty to refrain from prejudging the outcome of a trial, e.g. by abstaining from making public statements affirming the guilt of the accused.[5] Consequently, as no judgement had been made as to the criminal liability of the author, the Committee considers that the direct reference to the author's case by the President of the Republic, and the form it took, violated the principle of the presumption of innocence, as set out in article 14, paragraph 2, of the Covenant, which applies to every accused person in the absence of a judgement to the contrary.

7.5   With regard to the author's claim in respect of article 14, paragraph 3 (c), that he was not tried within a reasonable time and without undue delay, the Committee takes note of the State party's arguments that it cannot be held responsible for the delay in the trial; that the trial was delayed because the author's request for cognizance by a higher court was found to have merit by the Supreme Court, resulting in the annulment of the proceedings related to the charge of embezzlement; and that both the author and the Public Prosecution Service, in exercising their rights and meeting their obligations, made use of all available remedies to challenge various measures taken in the course of the proceedings.

7.6   The Committee notes that the author was charged for the first time in 2005, formally indicted in March 2007 and held in pretrial detention from 8 February 2007 to 10 December 2009. When the communication was submitted, on 9 March 2010, no judgement had been made regarding his possible criminal liability, as the proceedings were at the stage of the preliminary hearing. The Committee also notes that the hearings were repeatedly suspended because no representative of the prosecution was in attendance, and because the author's request for cognizance by a higher court, submitted on 19 November 2008, was admitted by the Supreme Court seven months later, on 17 June 2008, and ruled upon 18 months later, on 7 May 2009.

7.7   The Committee recalls that the reasonableness of the delay in a trial has to be assessed in the circumstances of each case, taking into account the complexity of the case, the conduct of the accused and the manner in which the matter was dealt with by the administrative and judicial authorities.[6] In the circumstances of this case, the Committee is of the view that the State party's observations do not adequately explain how the delays in the proceedings can be attributed to the conduct of the author or the complexity of the case.[7] Consequently, the Committee considers that the proceedings against the author suffered from undue delay, contrary to the provisions of article 14, paragraph 3 (c), of the Covenant.

---

[5]   Ibid., para. 30.

[6]   Ibid., para. 35.

[7]   See communication No. 1887/2009, *Juan Peirano Basso v. Uruguay*, Views adopted on 19 October 2010, para. 10.3.

7.8     With regard to the alleged violations of article 9 of the Covenant, the Committee takes note of the author's claim that the pretrial detention order issued by Court No. 3 was arbitrary because it did not meet the requirements established by law; that he was not informed immediately of the charges against him which motivated his arrest; and that he did not have access to a rapid judicial review of the legality of his arrest within a reasonable period. Moreover, on completion of the maximum 2-year period of pretrial detention, on 8 February 2009, he was not released even though there were no serious grounds for refusing to do so and no formal decision in that respect. The decision to extend his detention, taken by Court No. 27 on 4 June 2009 and amended by the Appeal Court on 8 October 2009, had no basis in law. The Committee also takes note of the State party's arguments that the author, thanks to his business position and financial situation, could easily have fled; that the Attorney-General's Office was required by law to apply for a pretrial detention order, under article 251, paragraph 1, of the Code of Criminal Procedure, since there is a presumption of flight risk in cases where the offence of which the accused is charged carries a prison sentence of 10 years or more, as in the author's case; and that the author had access to all means of defence with which to challenge this measure.

7.9     The Committee notes that on 8 February 2007, when he learned that the Attorney-General's Office had ordered his pretrial detention, the author presented himself voluntarily to the authorities, who placed him in pretrial detention on the basis of the order issued by Court No. 3. On 13 March 2007, the Appeal Court dismissed the author's appeal against that measure. On 19 November 2007 the author filed a request for cognizance before the Supreme Court, which, after 17 months, was declared to be admissible in part on 7 May 2009. The Committee also notes that the maximum legal period of pretrial detention expired on 8 February 2009. However, the author was not released and, even though the law itself provides for the possibility of extending the detention where there are serious grounds for so doing, the order to extend it was not issued until 4 June 2009. The measure was modified on 10 December 2009, when the author was released, partly thanks to the opinion adopted by the Working Group on Arbitrary Detention. However, on 18 December 2009 the measure was revoked and the author was ordered to be detained again.

7.10    The Committee recalls that pretrial detention should be the exception and as short as possible.[8] Also, pretrial detention must not only be lawful but also reasonable and necessary in all circumstances, for example to prevent flight, interference with the evidence or repetition of the crime.[9] In the light of the information provided, the Committee considers that the State party has not given sufficient reasons, other than the mere assumption that he would try to abscond, to justify the initial pretrial detention of the author or its subsequent extension; nor has it explained why it could not take other measures to prevent his possible flight or why the detention order was not extended until months after the 2-year period had expired. Although it is true that in the end the author fled the country in spite of the arrest warrant issued by Court No. 31 on 18 December 2009, the Committee notes that it was the irregularities in the proceedings that prompted his flight, as recounted above. The Committee therefore concludes that the pretrial detention of the author violated article 9 of the Covenant.

8.      The Human Rights Committee, acting under article 5, paragraph 4, of the Optional Protocol to the International Covenant on Civil and Political Rights, is of the view that the

---

[8] See the Committee's general comment No. 8 (1982) on the right to liberty and security of persons (*Official Records of the General Assembly, Thirty-seventh Session, Supplement No. 40*, [A/37/40] Annex V), para. 3.

[9] See communications No. 305/1988, *Hugo van Alphen v. The Netherlands*, Views adopted on 23 July 1990, para. 5.8; No. 560/1993, *A. v. Australia*, Views adopted on 3 April 1997, para. 9.2 and No. 1128/2002, *Rafael Marques de Morais v. Angola*, Views adopted on 29 March 2005, para. 6.1.

information before it discloses a violation by the State party of articles 9 and 14, paragraphs 1, 2 and 3 (c), of the Covenant.

9. In accordance with article 2, paragraph 3 (a), of the Covenant, the State party is under an obligation to provide the author with an effective remedy, including by: (a) if the author faces trial, ensuring the trial affords all the judicial guarantees provided for in article 14 of the Covenant; (b) assuring him that he will not be held in arbitrary detention for the duration of the proceedings; and (c) providing the author with redress, particularly in the form of appropriate compensation. The State party is also under an obligation to prevent similar violations in the future.

10. Bearing in mind that, by becoming a party to the Optional Protocol, the State party has recognized the competence of the Committee to determine whether or not there has been a violation of the Covenant and that, pursuant to article 2 of the Covenant, the State party has undertaken to ensure to all individuals within its territory or subject to its jurisdiction the rights recognized in the Covenant and to provide an effective and enforceable remedy when a violation has been established, the Committee wishes to receive from the State party, within 180 days, information about the measures taken to give effect to the Committee's Views. The State party is also requested to publish the present Views and to have them widely disseminated.

[Adopted in English, French and Spanish, the Spanish text being the original version. Subsequently to be issued also in Arabic, Chinese and Russian as part of the Committee's annual report to the General Assembly.]

---